**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign Representatives*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>**FAIRFIELD SENTRY LIMITED, et al.,**<br><br>   Debtors in Foreign Proceedings. | **Chapter 15 Case**<br><br>**Case No. 10-13164 (BRL)**<br><br>**Jointly Administered** |
| **FAIRFIELD SIGMA LIMITED (IN LIQUIDATION), acting by and through the Foreign Representatives thereof, and KENNETH KRYS and JOANNA LAU, solely in their capacities as Foreign Representatives and Liquidators thereof,**<br><br>                                        **Plaintiffs,**<br><br>                    -against-<br><br>**BANQUE BENEDICT HENTSCH & CIE S.A. and BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF BANQUE BENEDICT HENTSCH & CIE S.A. 1-1000,**<br><br>                                        **Defendants.** | **Adv. Pro. No. _____**<br><br>**COMPLAINT** |

Fairfield Sentry Limited ("Sentry"), Fairfield Sigma Limited ("Sigma") and

Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the

"Debtors"), by and through Kenneth Krys and Joanna Lau (together with their predecessors, the

"Foreign Representatives"), and Kenneth Krys and Joanna Lau (together with Sigma, the

"Plaintiffs"), solely in their capacities as the Foreign Representatives and Liquidators of the

liquidation proceedings involving the Funds pending before the Commercial Division of the

Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1. This action and similar actions are brought by the Plaintiffs, with the approval of the BVI Court, to recover payments made to shareholders for the redemption of shares in the Funds prior to December 2008.

2. The Funds were created as a means for private investment in managed accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that Bernard L. Madoff used to perpetrate his massive Ponzi scheme. Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS. Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss Franc investments) through purchase of shares of Sentry. Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly held by BLMIS for Sentry. As stated in their offering materials, the Funds' investment objective was to achieve capital appreciation of assets through investments in BLMIS (directly, in the case of Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

3. It is now known that these types of feeder funds were essential to the perpetration of Madoff's Ponzi scheme. In order for the Ponzi scheme to operate, Madoff required a continuous flow of new investors and investments to be able to satisfy redemption requests from early investors. Feeder funds, such as Sentry, brought new investors into this scheme, allowing

Madoff to make payments to early investors and thereby creating and perpetuating the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.      From the Funds' inception until the disclosure of Madoff's fraud in December 2008, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares were transferred (either directly in the case of Sentry or indirectly through Sentry in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff. Prior to December 2008, the voting, participating shares of Sentry ($.01 par value per share), Sigma (€01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a price equal to the applicable Fund's "Net Asset Value." Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each fund, net of certain expenses ("Net Asset Value").

5.      From time to time, in order to make payments to investors for redemption of Shares ("Redemption Payments"), Sentry made withdrawals from its BLMIS accounts. At all relevant times, the Funds believed payments that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by BLMIS for Sentry. The amount, per share, paid by the Funds to shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which was calculated based on the assets that the Funds believed were being held, and investments that were being made, by BLMIS for Sentry's account.

6.      As the world now knows, Madoff was operating a massive Ponzi scheme through BLMIS. Thus, at all relevant times, the money that Sentry transferred to BLMIS was not invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise misappropriated by Madoff for unauthorized uses. Further, none of the securities shown on

statements provided to Sentry by BLMIS were in fact purchased for Sentry. Additionally, none of the amounts withdrawn by Sentry from its accounts with BLMIS were proceeds of sales of securities or other investments. Instead, such amounts represented the monies of more recent investors into the Madoff scheme.

7.     In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-existent, and the Funds were insolvent at the time Redemption Payments were made or they were rendered insolvent by those payments. As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the actual Net Asset Value of Shares redeemed.

8.     At all relevant times, all payments made from BLMIS to Sentry and other feeder funds and investors were made by Madoff to perpetuate his Ponzi scheme and avoid detection of his fraud. Similarly, the Redemption Payments that the Funds made to redeeming shareholders were not made in the ordinary course of any business or for any legitimate purposes. Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as the source of these payments was not the sales of securities, or return of investments, as contemplated by those documents. Rather, the payments were derived from uninvested monies of other BLMIS investors or other uninvested deposits made by Sentry in BLMIS, but in either event, they represented the fraudulent and ill-gotten gains of Madoff's Ponzi scheme, distributed by BLMIS to Sentry. These payments and other payments made to BLMIS investors were crucial in perpetuating the Ponzi scheme and maintaining the illusion that Madoff was making actual investments and employing a successful investment strategy.

9.     During the period from August 31, 2008, through November 21, 2008, following the receipt by Sigma of notices of redemption, Sigma made Redemption Payments to Defendant Banque Benedict Hentsch & Cie S.A. ("Banque Benedict") aggregating USD $9,583,495.12.  At the time such payments were made, Sigma mistakenly believed that such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption.  In fact, however, as stated, the Redemption Payments made to Banque Benedict far exceeded the actual Net Asset Value of the Shares redeemed.  Moreover, the source of these Redemption Payments was not, as Sigma believed them to be, proceeds of the liquidation of securities or investments held for their accounts.  Instead, any amounts obtained by Sigma from BLMIS to make Redemption Payments to Banque Benedict were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

10.     Upon information and belief, Banque Benedict has either retained the Redemption Payments made to it by Sigma for its own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities for whom Banque Benedict may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (the "Beneficial Shareholders," together with Banque Benedict, the "Defendants").

11.     Following the revelation of Madoff's fraud in December 2008, the Funds' boards of directors suspended any further redemptions of the Funds' shares and the calculation of each of the Funds' Net Asset Value.  As of December 2008 and presently, Sentry, Sigma, and Lambda have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

12.     The Funds' actual assets are far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against each of them.  In particular,

claims have been asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (BRL) (the "BLMIS Adversary Proceeding").

13.    As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee seeks to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion. This amount is alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud. The BLMIS Trustee alleges that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors. At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments. Monies received from BLMIS to fund Redemption Payments thereby gave rise to alleged liabilities and subjected the Funds to claims that the Funds were and are unable to pay or that caused the Funds to become insolvent and/or deepened their existing insolvency.

14.    Unless Redemption Payments paid to shareholders are recovered for the Funds' estates, the Funds will be unable to satisfy their liabilities and claims that have been made or may be made against them. Moreover, to the extent such liabilities and claims must be satisfied solely from the Funds' current assets, Defendants will have been unjustly enriched as they will not bear their proportionate share of such liabilities and claims, but rather will retain a windfall at the expense of other shareholders and creditors of the Funds.

## JURISDICTION AND VENUE

15.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re Fairfield Sentry Limited, et al., No. 10-13164 (BRL), pending in this Court.  Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC, SIPA Liquidation No. 08-1789 (BRL).  Pursuant to the standing order of reference of the United States District Court for the Southern District of New York, dated July 10, 1984, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

16.     This is a core proceeding under 28 U.S.C. §§ 157(b)(2).  Should the Court determine this to be a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

17.     This Court has jurisdiction over Banque Benedict and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure because Banque Benedict and the Beneficial Shareholders, on information and belief, conducted investment transactions from within or directed to the United States.

18.     Moreover, this Court has jurisdiction over Banque Benedict and any Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth

in one or more Subscription Agreements Banque Benedict entered into with Sigma (collectively, the "Subscription Agreements").

19.     The Subscription Agreements provide for, *inter alia*, the irrevocable submission by Banque Benedict to the jurisdiction of the New York courts with respect to any proceeding with respect to said agreement and Sigma and Banque Benedict's consent to service of process by the mailing of such process, as provided therein. In particular, the Subscription Agreements provide as follows:

> New York Courts. Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum. Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records. Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

20.     Furthermore, by executing the Subscription Agreements, Banque Benedict agreed to all terms and conditions contained therein, including the express provision that any agreement made by Banque Benedict in the Subscription Agreement would also apply to any other person for whom Banque Benedict was subscribing as trustee, agent, representative, or nominee – i.e., all Beneficial Shareholders. Moreover, by executing the Subscription Agreements, Banque Benedict represented that it had all requisite authority from Beneficial Shareholders to execute and perform any and all obligations on their behalf, and also agreed to indemnify Sigma for any damages resulting from an assertion by a Beneficial Shareholder that Banque Benedict lacked proper authorization to enter into the Subscription Agreement or perform the obligations thereof. Specifically, the Subscription Agreements provide as follows:

<u>If Subscriber is acting as a Representatives</u>.  If Subscriber is subscribing as trustee, agent, representatives, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder.  Subscriber also agrees to indemnify the Fund . . . for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

### Plaintiffs

22.     Sigma, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sigma's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.  Sigma is currently in liquidation in proceedings commenced on April 23, 2009, in the BVI Court.

23.     The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and behalf of the Funds or in their own official names.  On April 23, 2009, the BVI Court issued an order appointing Christopher Stride (Ms. Lau's predecessor) as liquidator of Lambda (the "<u>Lambda Appointment Order</u>").  On July 21, 2009, the BVI Court issued an order appointing Mr. Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "<u>Sentry & Sigma Appointment Order</u>").  On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and Ms. Lau's appointment as joint liquidator with Mr.

Krys of all three Funds (the "Supplemental Appointment Order" and, together with the Lambda Appointment Order and the Sentry & Sigma Appointment Order, the "BVI Appointment Orders"). The Foreign Representatives have been authorized by the BVI Court to bring, in their capacities as Foreign Representatives and liquidators of the Funds, this action and the claims herein, including the avoidance claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

24.     Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property. After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15. On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

25.     Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code. Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a). Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section

1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the BVI Proceedings.

**Defendants**

26.     Banque Benedict was, at all relevant times, a member of Sigma and a registered holder of Shares.  Upon information and belief, Banque Benedict is a corporate entity organized under the laws of Switzerland and having its registered address at 3 Rue General Dufour, 1204 Geneva, Switzerland and/or 5, avenue de Châtelaine, CH-1203 Geneva, Switzerland.  Banque Benedict subscribed for the purchase of Shares by entering into one or more Subscription Agreements with Sigma (collectively, the "Subscription Agreements").  All purchases of Shares by Banque Benedict were subject to the terms of the Subscription Agreements.

27.     Defendants "Beneficial Owners of the Accounts Held in the Name of Banque Benedict Hentsch & Cie SA" - i.e., the Beneficial Shareholders - are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sigma issued to Banque Benedict and on whose behalf Banque Benedict was acting as trustee, agent, representative, or nominee (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders").

## NOTICE PURSUANT TO FED. R. CIV. P. 44.1

28.     Certain or all of the issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

## FACTUAL ALLEGATIONS

**Role of Feeder Funds In Madoff Fraud**

29.     Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry.  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

30.     As discussed above, Sentry, Sigma and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

**Calculation of Net Asset Value and Shareholder Redemption Payments**

31.     Substantially all of the money (some 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy.  In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each

Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

32.     In calculating each of the Funds' Net Asset Value, the Funds used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry. Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to purported cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and other documents to calculate the Net Asset Value of the Shares.

33.     In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the accounts was based on misinformation and fictitious account statements. None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred. Indeed, no investments of any kind were ever made by BLMIS for Sentry. At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious. Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

34.     From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts. The Funds believed that the amounts provided in connection with such withdrawals represented proceeds from the

sale or liquidation of securities or investment positions held by BLMIS for the account of Sentry. In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud. At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud. The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose. Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.

35.    Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme. At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

**Redemption Payments Made or Transferred to Defendants**

36.    During the period from August 31, 2008, through November 21, 2008, Banque Benedict received Redemption Payments totaling USD $9,583,495.12 from Sigma in respect of Shares tendered for redemption.

37.    The dates and amounts of each Redemption Payment received by Banque Benedict from Sigma are set forth on Exhibit A.

38.     In exchange for each Redemption Payment, each of which constitutes a transaction between Banque Benedict and Sigma, Sigma received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sigma.

39.     Upon information and belief, Banque Benedict and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

**Exposure of Madoff's Fraud**

40.     On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  See United States v. Madoff, No. O8-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

41.     On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS.  See SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

42.     In March 2009, Madoff pleaded guilty to the criminal charges brought against him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December

11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC." As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal. Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised. Instead, those funds were deposited in a bank account at Chase Manhattan Bank. When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

43.     Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

44.     Madoff is now serving a 150-year sentence in federal prison.

**The Funds' Estates in Liquidation**

45.     Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values. As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

46.     In 2009, the Funds were put into liquidation proceedings in the BVI.

47.     On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over

Lambda (the "<u>Lambda Proceeding</u>").  The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

48.     On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "<u>Sentry Proceeding</u>").  The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

49.     On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "<u>Sigma Proceeding</u>" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "<u>BVI Liquidation Proceedings</u>").  The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

50.     As alleged above, the BVI Court issued orders – the BVI Appointment Orders – appointed the Foreign Representatives as liquidators of the Funds.  Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

51.     The BVI Appointment Orders grant the Liquidators all powers set forth in Section 186, Schedule 2 of the BVI Insolvency Act, including, but not limited to, the following:

  a.  to pay any class of creditors in full;

  b.  to make a compromise or arrangement with creditors or persons claiming to be creditors, or having or alleging that they have any claim against the Funds, whether present or future, certain or contingent, ascertained or not;

  c.  to compromise any claims, debts or liabilities capable of resulting in claims or debts whether present or future, certain or contingent, ascertained or not, between the Funds and any person or entity, and to compromise questions in any way relating to or affecting the assets or the liquidations of the Funds;

  d.  to commence, continue, discontinue, or defend any action or other legal proceeding in the name and on behalf of the Funds in the BVI or elsewhere;

e.    to carry on the Funds' business so far as may be necessary for its beneficial liquidation;

f.    to make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the Funds or for which the Funds may be rendered liable;

g.    to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the Funds and a contributory or alleged contributory or other Funds or person apprehending liability to the Company;

h.    to deal with all questions in any way relating to or affecting the assets or the winding up of the Funds to take any security for the discharge of any such call, debt, liability or claim and to give a complete discharge in respect of it;

i.    to sell or otherwise dispose of property of the Funds;

j.    to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents;

k.    to use the Funds' seal;

l.    to draw, accept, make and endorse any bill of exchange or promissory note in the name and on behalf of the Funds;

m.    to borrow money, whether on the security of assets of the Funds or otherwise;

n.    to take out in an official capacity letters of administration for any deceased member or past member or debtor, or to do any other act necessary for obtaining payment of any money due from a member or past member or debtor;

o.    to call meetings of the creditors or members for (i) the purpose of informing the creditors or members concerning the progress of or other matters arising in the liquidation; (ii) the purpose ascertaining the views of creditors or members on any matter arising in the liquidation; or (iii) such other purposes connected with the liquidation as the liquidators considers fit;

p.    to appoint a solicitor, accountant or other professionally qualified person to assist in the performance of the liquidators' duties;

q.   to appoint an agent to do any business that the liquidators are unable to do themselves, or which can be more conveniently done by an agent;

r.   to apply to the BVI Court for directions concerning any matter arising out of the exercise of any of the liquidators' powers; and

s.   to do all things incidental to any of the liquidators' powers.

52.   The Foreign Representatives must seek BVI Court approval before they can exercise any of the first five powers enumerated in the BVI Appointment Orders.  *See* BVI Act § 186(3) ("The Court may provide that certain powers may only be exercised with the sanction of the Court.").  The Foreign Representatives may exercise all of the other powers enumerated in the BVI Appointment Orders without prior BVI Court approval.

53.   With the express authorization of the BVI Court, the Foreign Representatives filed petitions in this Court on June 14, 2010 seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15 of the Bankruptcy Code.  On July 22, 2010, the Bankruptcy Court issued the Recognition Order, which, among other things, specifically entrusted the Foreign Representatives with the administration and realization of the Funds' assets located in the United States, including any and all claims and causes of action belonging to the Funds.

54.   Acting in accordance with authority afforded to them by the Recognition Order and with the duties and powers afforded to them as liquidators under the BVI Insolvency Act, and with the approval of the BVI Court, the Foreign Representatives have brought this and similar actions on behalf of the Funds, and/or in their capacities as liquidators of the Funds, to recover Redemption Payments made to the Funds' investors in the years prior to the exposure of the Madoff fraud.

55.   On December 9, 2010, the BVI Court issued an order authorizing the Foreign Representatives to assert claims seeking: (i) a declaration that the Redemption Payments were

unfair preferences under Section 245 of the BVI Insolvency Act and were undervalue transactions under Section 246 of the BVI Insolvency Act, and (ii) an order setting aside the Redemption Payments, restoring the Funds to the position that they would have been had the Redemption Payments not been paid and such further and other relief as the Foreign Representatives deem necessary.

**Claims Against the Funds in the BLMIS Liquidation**

56.     On December 15, 2008, a trustee was appointed for the liquidation of the BLMIS estate.  Proceedings for such liquidation are pending in the Bankruptcy Court for the Southern District of New York under the caption <u>Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC</u>, SIPA Liquidation No. 08-1789 (BRL).

57.     On May 18, 2009, the BLMIS Trustee commenced the BLMIS Adversary Proceeding against Sentry and other defendants.  In the BLMIS Adversary Proceeding, the BLMIS Trustee seeks to recover approximately $3.2 billion from the Funds and others on account of transfers that BLMIS allegedly made to Sentry and, through Sentry, to Sigma, Lambda and other persons during the six year period preceding the filing of the BLMIS liquidation proceedings.  These transfers are alleged by the BLMIS Trustee to have been preferential transfers under Section 547 of the Bankruptcy Code and/or fraudulent transfers under Sections 544 and 548 of the Bankruptcy Code and applicable state law.  The BLMIS Adversary Proceeding is currently pending and the claims asserted therein are unresolved.

58.     At present, without recovery of Redemption Payments made to shareholders, the Funds' assets are not sufficient to satisfy contingent and non-contingent liabilities of the Funds' estates, including payments that could be due and owing to the BLMIS Trustee for distribution to Madoff victims in the BLMIS liquidation proceedings.  The Redemption Payments that were

made to Defendants were mistaken payments and avoidable transactions, and generally represent assets of Sigma's estate that Defendants are not entitled to keep.

## FIRST CLAIM
### (Unjust Enrichment- Against Banque Benedict)

59.     Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sigma and on behalf of Sigma) repeats and alleges again the allegations contained in paragraphs 1 through 58 above as if set forth herein.

60.     As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Banque Benedict, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.   The source of these Redemption Payments was not, as Sigma mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

61.     Banque Benedict did not provide valuable consideration to Sigma in exchange for each of the Redemption Payments received by it.

62.     Upon information and belief, Banque Benedict received and retained Redemption Payments in excess of amounts paid by it for the purchase of Shares of and in Sigma.

63.     By reason of its receipt of monies deposited by other BLMIS investors or previous deposits made by Sentry with BLMIS, Banque Benedict has been unjustly enriched to the detriment of Sigma and other shareholders and creditors of Sigma.

64.     It would offend principles of equity and good conscience to permit Banque Benedict to retain the Redemption Payments it received from Sigma.

65.     The Foreign Representatives, in their capacities as liquidators of Sigma and on behalf of Sigma, are entitled to recover from Banque Benedict an amount equal to the Redemption Payments received by it from Sigma.

## SECOND CLAIM
### *(Unjust Enrichment- Against Beneficial Shareholders)*

66.     Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sigma and on behalf of Sigma) repeats and alleges again the allegations contained in paragraphs 1 through 65 above as if set forth herein.

67.     Upon information and belief, Banque Benedict may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for Beneficial Shareholders.

68.     Upon information and belief, Banque Benedict may have paid to or credited some or all of the Redemptions Payments received by it from Sigma to accounts of Beneficial Shareholders.  As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Banque Benedict, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments was not, as Sigma mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

69.     The Beneficial Shareholders did not provide valuable consideration to Sigma in exchange for any portion of any of the Redemption Payments received by them.

70.     Upon information and belief, some or all of the Beneficial Shareholders received and retained Redemption Payments in excess of amounts paid by them for the purchase of Shares.

71.     To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to Banque Benedict in its capacity as trustee, agent, representative, or nominee for a Beneficial Shareholder, such Beneficial Shareholder has been unjustly enriched to the detriment of Sigma and other shareholders and creditors of Sigma.

72.     It would offend principles of equity and good conscience to permit any Beneficial Shareholders to retain the Redemption Payments made by Sigma.

73.     The Foreign Representatives, in their capacities as liquidators of Sigma and on behalf of Sigma, are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them.

### THIRD CLAIM
*(Money Had and Received-Against Banque Benedict)*

74.     Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sigma and on behalf of Sigma) repeats and alleges again the allegations contained in paragraphs 1 through 73 above as if set forth herein.

75.     As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Banque Benedict, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.   The source of these Redemption Payments was not, as Sigma mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

76.     Banque Benedict did not provide valuable consideration to Sigma in exchange for each of the Redemption Payments received by it.

77.     Upon information and belief, Banque Benedict received and retained Redemption Payments in excess of amounts paid by it for the purchase of  Shares.

78.    By reason of its receipt of monies representing the deposits of other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud, Banque Benedict has been unjustly enriched to the detriment of Sigma and other shareholders and creditors of Sigma.

79.    Furthermore, Banque Benedict was not entitled to receive the Redemption Payments because the amounts of each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Banque Benedict for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares.

80.    To the extent that Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sigma and on behalf of Sigma, the loss will be disproportionately and unjustly borne by Sigma and other shareholders and creditors of Sigma.

81.    It would offend principles of equity and good conscience to permit Banque Benedict to retain the Redemption Payments it received from Sigma.

82.    The Foreign Representatives, in their capacities as liquidators of Sigma and on behalf of Sigma, are entitled to recover from Banque Benedict an amount equal to the Redemption Payments received by it from Sigma.

## FOURTH CLAIM
### *(Money Had and Received-Against Beneficial Shareholders)*

83.    Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sigma and on behalf of Sigma) repeats and alleges again the allegations contained in paragraphs 1 through 82 above as if set forth herein.

84.     Upon information and belief, Banque Benedict may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for Beneficial Shareholders.

85.     Upon information and belief, Banque Benedict may have paid to or credited some or all of the Redemption Payments received by it to accounts of Beneficial Shareholders.  As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Banque Benedict, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments was not, as Sigma mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

86.     The Beneficial Shareholders did not provide valuable consideration to Sigma in exchange for any portion of any of the Redemption Payments received by them.

87.     Upon information and belief, some or all of the Beneficial Shareholders  received and retained Redemption Payments in excess of amounts paid by them for the purchase of Shares.

88.     To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to Banque Benedict in its capacity as trustee, agent, representative, or nominee for Beneficial Shareholders, such Beneficial Shareholders have been unjustly enriched to the detriment of Sigma and other shareholders and creditors of Sigma.

89.     Furthermore, Beneficial Shareholders were not entitled to receive any portion of the Redemption Payments paid to Banque Benedict upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for Beneficial Shareholders because the amounts transferred by Sentry with respect to each of the Redemption Payments was based on a

miscalculated and inflated Net Asset Value, which caused the payment received for redemption of Shares to be in excess of the actual Net Asset Value of such Shares.

90.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sigma and on behalf of Sigma, the loss will be disproportionately and unjustly borne by Sigma and other shareholders and creditors of Sigma.

91.    It would offend principles of equity and good conscience to permit Beneficial Shareholders to retain the Redemption Payments made by Sigma.

92.    The Foreign Representatives, in their capacities as liquidators of Sigma and on behalf of Sigma, are entitled to recover from Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them.

## FIFTH CLAIM
### *(Mistaken Payment-Against Banque Benedict)*

93.    Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sigma and on behalf of Sigma) repeats and alleges again the allegations contained in paragraphs 1 through 92 above as if set forth herein.

94.    As described above, Sigma made each of the Redemption Payments to Banque Benedict under the mistaken belief that the amounts paid to Banque Benedict represented the proceeds of the sale of securities and investments held for Sentry in accounts established with BLMIS.

95.    Upon information and belief, however, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to Banque Benedict represented, in fact, money deposited with BLMIS by

other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

96.     The Redemption Payments, while benefiting Banque Benedict, were made to the detriment of Sigma and other shareholders and creditors of Sigma.

97.     Additionally, Banque Benedict was not entitled to receive the Redemption Payments because, as was unknown to Sigma, the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Banque Benedict for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares.  In these circumstances, the Redemption Payments should be returned for the benefit of Sigma, their creditors and the current holders of Shares in Sigma.

98.     Banque Benedict did not provide valuable consideration to Sigma in exchange for each of the Redemption Payments received by it.

99.     Upon information and belief, Banque Benedict received and retained Redemption Payments in excess of amounts paid by it for the purchase of  Shares.

100.     To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sigma and on behalf of Sigma, the loss will be disproportionately and unjustly borne by Sigma and other shareholders and creditors of Sigma.

101.     It would thus offend principles of equity and good conscience to permit Banque Benedict to retain the Redemption Payments.

102.     The Foreign Representatives, in their capacities as liquidators of Sigma and on behalf of Sigma, are entitled to recover from Banque Benedict a sum in an amount equal to the Redemption Payments received by it from Sigma.

## SIXTH CLAIM
### *(Mistaken Payment-Against Beneficial Shareholders)*

103.     Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sigma and on behalf of Sigma) repeats and alleges again the allegations contained in paragraphs 1 through 102 above as if set forth herein.

104.     As described above, Sigma made each of the Redemption Payments to Banque Benedict  under the mistaken belief that the amounts paid to Banque Benedict represented the proceeds of the sale of securities and investments held for Sentry in accounts established with BLMIS.

105.     However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to Banque Benedict represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

106.     Upon information and belief, Banque Benedict may have paid to or credited some or all of the Redemption Payments received by it to accounts of Beneficial Shareholders.  As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Banque Benedict, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments was not, as Sigma mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

107.     Additionally, Beneficial Shareholders were not entitled to receive any portion of the Redemption Payments received by Banque Benedict upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for Beneficial Shareholders

because, as was unknown to Sigma, the amounts transferred with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by Banque Benedict for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares.

108.    The Beneficial Shareholders did not provide valuable consideration to Sigma in exchange for any portion of any of the Redemption Payments received by them.

109.    Upon information and belief, some or all of the Beneficial Shareholders received and retained Redemption Payments in excess of amounts paid by them for the purchase of Shares.

110.    The Redemption Payments, while benefiting any Beneficial Shareholder receiving any portion thereof, were made to the detriment of Sigma and other shareholders and creditors of Sigma.

111.    It would thus offend principles of equity and good conscience to permit any Beneficial Shareholder to retain the Redemption Payments.

112.    The Foreign Representatives in their capacities as liquidators of Sigma and on behalf of Sigma are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them.

## SEVENTH CLAIM
*(Constructive Trust-Against all Defendants)*

113.    Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sigma and on behalf of Sigma) repeats and alleges again the allegations contained in paragraphs 1 through 112 above as if set forth herein.

114.    As described above, upon receipt of a redemption request, Sigma made each of the Redemption Payments to Banque Benedict based on a miscalculated and inflated Net Asset

Value, which caused those Redemption Payments to be in excess of the actual Net Asset Value of redeemed Shares.

115.     As alleged above, the Redemption Payments represented money deposited with BLMIS by other BLMIS investors or previous deposits of Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.    The source of these Redemptions Payments was not, as Sigma mistakenly believed, proceeds from the sale of securities and investments held by BLMIS for the account of Sentry.

116.     Upon information and belief, Banque Benedict may have paid some or all of the Redemptions Payments it received to Beneficial Shareholders.

117.     By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sigma and other shareholders and creditors of Sigma.

118.     Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Banque Benedict for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares.

119.     It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

120.     By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sigma for the benefit of the Foreign Representatives and Sigma and other shareholders and creditors of Sigma.

## EIGHTH CLAIM
### (Unfair Preference Pursuant to Section 245 of the BVI
### Insolvency Act - Against Banque Benedict)

121.     The Foreign Representatives, in their capacities as Foreign Representatives and

liquidators of Sigma, repeat and allege again the allegations contained in paragraphs 1 through

120 above as if set forth herein.

122.     Section 245 of the BVI Insolvency Act provides:

(1) Subject to subsection (2), a transaction entered into by a company is an unfair
preference given by the company to a creditor if the transaction (a) is an
insolvency transaction; (b) is entered into within the vulnerability period; and
(c) has the effect of putting the creditor into a position which, in the event of the
company going into insolvent liquidation, will be better than the position he
would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the
ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered
into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability
period has the effect specific in subsection 1(c) in respect of a creditor who is a
connected person, unless the contrary is proved, it is presumed that the transaction
was an insolvency transaction and that it did not take place in the ordinary course
of business.

123.     A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against
the debtor, whether by assignment or otherwise, that is, or would be, an
admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is
a company or a foreign company; or (b) the bankruptcy of the debtor, in the case
of a debtor who is an individual.

124.     The BVI Insolvency Act further defines an "insolvency transaction" as a

transaction that: "(a) is entered into at a time when the company is insolvent; or (b) …causes the

company to become insolvent."  BVI Insolvency Act, § 244(2).

125.     For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c) … (ii) the company is unable to pay its debts as they fall due." BVI Insolvency Act, §§ 8, 244(3).

126.     For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator . . . ." BVI Insolvency Act § 244(1).

127.     The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed."  BVI Insolvency Act, § 244(1).  Thus, the vulnerability period, for each of the Funds, is the period commencing two years prior to the application for the appointment of Liquidators for each Fund and ending on the date of the appointment of the liquidators of each Fund.

128.     A "connected person" is:

(1) …one or more of the following

(a) a promoter of the company;

(b) a director or *member of the company* or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

(h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

BVI Insolvency Act, § 5 (emphasis added).

129.     Redemption Payments aggregating USD $9,583,495.12 were made by Sigma to Banque Benedict during the two-year period prior to the application for appointment of the Liquidators of Sigma in the BVI Liquidation Proceedings (the "Sigma Vulnerability Period").

130.     During the Sigma Vulnerability Period, Sigma was insolvent or was rendered insolvent by the making of Redemption Payments.

131.     Each of the Redemption Payments made during the Sigma Vulnerability Period ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

132.     Banque Benedict was a shareholder (i.e., a member) of Sigma during the Sigma Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

133.     Each of the Vulnerability Period Payments put Banque Benedict in a better position than it would have been in had such Payment not been made.

134.     Because Banque Benedict was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Vulnerability Period Payments were "insolvency transactions" and, "did not take place in the ordinary course of business." Further, even were this not presumed, the Vulnerability Period Payments were not made in the ordinary course of any business of Sigma, nor were they made for any legitimate business purpose, in that, among other things, each Vulnerability Period Payment was determined and paid based on a fictitious Net Asset Value and was made incidental to and as a necessary part of Madoff's Ponzi scheme.

135.    Each of the Vulnerability Period Payments was made following receipt by Sigma of a notice of redemption in respect of Shares.  Following the receipt by Sigma of a notice of redemption by Banque Benedict and until such time as Banque Benedict received the Vulnerability Period Payment that became due and payable by reason of Banque Benedict's redemption of Shares, Banque Benedict was a "creditor" of Sigma as defined in the BVI Insolvency Act, as Banque Benedict would have had an admissible claim against Sigma in the BVI Liquidation Proceeding had the Vulnerability Period Payment not been made.

136.    Further, upon information and belief, Banque Benedict may assert claims against Sigma in this action or elsewhere which, if proven, allowed and/or admitted, would make it a "creditor" of Sigma as defined by the BVI Insolvency Act.

137.    By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sigma, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to recover from Banque Benedict an amount equal to the Vulnerability Period Payments received by Banque Benedict from Sigma.

### NINTH CLAIM
*(Unfair Preference Pursuant to Section 245 of the BVI*
*Insolvency Act - Against Beneficial Shareholders)*

138.    The Foreign Representatives, in their capacities as Foreign Liquidators of Sigma, repeat and allege again the allegations contained in paragraphs 1 through 137 above as if set forth herein.

139.    Upon information and belief, Banque Benedict may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreement in the capacity of trustee, agent, representative, or nominee for Beneficial Shareholders.

140.     Upon information and belief, Banque Benedict may have paid to or credited some or all of the Redemptions Payments received by it to accounts of Beneficial Shareholders.

141.     To the extent that any money that Banque Benedict received in connection with the Vulnerability Period Payments was transferred to Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sigma, are entitled to avoid and set aside such further transfer by Banque Benedict to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them.

## TENTH CLAIM
### *(Undervalue Transaction Pursuant to Section 246 of the BVI Insolvency Act - Against Banque Benedict)*

142.     The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sigma, repeat and allege again the allegations contained in paragraphs 1 through 141 above as if set forth herein.

143.     Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction with a person if (a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and (c) in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a) the company enters into the transaction in good faith and for the purposes of its business; and (b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that (a) the transaction was an insolvency transaction; and (b) subsection (2) did not apply to the transaction.

144.     During the Sigma Vulnerability Period, all assets purportedly held by BLMIS for Sentry and other investors were non-existent, and Sigma was insolvent or rendered insolvent by the Vulnerability Period Payments.  Thus, each of the Vulnerability Period Payments qualifies as an "insolvency transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of the BVI Insolvency Act.

145.     Sigma received no consideration for any of the Vulnerability Period Payments, or in the alternative, Sigma received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sigma to Banque Benedict for each of the Vulnerability Period Payments.

146.     Banque Benedict was a shareholder (i.e., a member) of Sigma during the Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

147.     Because Banque Benedict was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Vulnerability Period Payments were "insolvency transactions" and, "did not take place in the ordinary course of business."  Further, even were this not presumed, the Vulnerability Period Payments were not made in the ordinary course of any business of Sigma, nor were they made for any legitimate business purpose, in that, among other things, each Vulnerability Period Payment was determined and paid based on a fictitious Net Asset Value and was made incidental to and as a necessary part of Madoff's Ponzi scheme.

148.     By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sigma, are entitled to an order avoiding and setting aside the Vulnerability Period  Payments and to recover from Banque Benedict an amount equal to the Vulnerability Period  Payments received by Banque Benedict from Sigma.

### ELEVENTH CLAIM
*(Undervalue Transaction Pursuant to Section 246 of the*
*BVI Insolvency Act - Against Beneficial Shareholders)*

149.     The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sigma, repeat and allege again the allegations contained in paragraphs 1 through 148 above as if set forth herein.

150.     Upon information and belief, Banque Benedict may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreement in the capacity of trustee, agent, representative, or nominee for Beneficial Shareholders.

151.     Upon information and belief, Banque Benedict may have paid to or credited some or all of the Redemptions Payments received by it to accounts of Beneficial Shareholders.

152.     To the extent that any money that Banque Benedict received in connection with the Vulnerability Period Payments was transferred to Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sigma, are entitled to avoid and set aside such further transfer by Banque Benedict to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.      On the First, Third and Fifth, judgment in favor of Plaintiffs and against Banque Benedict allowing the Plaintiffs to recover an amount equal to the Redemption Payments received by Banque Benedict, plus interest;

B.      On the Second, Fourth and Sixth Claims, judgment in favor of Plaintiffs and against Beneficial Shareholders allowing the Plaintiffs to recover an amount equal to any portion of any Redemption Payments received by Beneficial Shareholders, plus interest;

C.      On the Seventh Claim, imposition of a constructive trust on Redemption Payments; and

D.      On the Eighth and Ninth Claims:

a.      a declaratory judgment in favor of the Foreign Representatives and against Banque Benedict and the Beneficial Holders that the Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

b.      judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Vulnerability Period Payments; and

c.      judgment pursuant to Section 249 of the BVI Insolvency Act against Banque Benedict and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest.

E.      On the Tenth and Eleventh Claims:

a.      a declaratory judgment in favor of the Foreign Representatives and against Banque Benedict and the Beneficial Holders that the Redemptions Payments made during the vulnerability period constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

b.      judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemption Payments made during the vulnerability period; and

c.      judgment pursuant to Section 249 of the BVI Insolvency Act against Banque Benedict and the Beneficial Holders in the amount of the avoided Redemption Payments received by them or for their benefit, plus interest.

F.　　Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses;

G.　　Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
　　　　April 1, 2011

BROWN RUDNICK LLP


By:　　/s/ David J. Molton
　　　　David J. Molton
　　　　May Orenstein
　　　　Daniel J. Saval
　　　　Kerry L. Quinn

Seven Times Square
New York, New York 10036
Telephone: 212.209.4800
Facsimile: 212.209.4801

*Attorneys for the Foreign Representatives*

**EXHIBIT A**

### Redemption Payments Received by Defendants from Sigma
### From August 31, 2008 Through November 21, 2008

| **Payment Date** | **Redemption Payment** | **No. of Shares** |
|---|---|---|
| August 31, 2008 | 7,682,623.31* | 29,962.8244 |
| November 21, 2008 | 1,900,871.80* | 7,797.1089 |

\* Denotes Redemptions in the Sigma Vulnerability Period.  All $USD amounts are based on the exchange rate as of the date of the Redemption Period.  However, upon application of a different exchange rate, as may be required by applicable law, the amount of damages may be different.